IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRISH PARHAM, | ) | Case No. 1:19-cv-2236 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Demetrish Parham, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Parham's applications for DIB and SSI be affirmed.

## II.  Procedural History

On August 11, 2016, Parham protectively applied for DIB and SSI.  (Tr. 233-42).[1] Parham alleged that she became disabled on January 10, 2012, due to anxiety, panic attacks, mood disorder, and high blood pressure.  (Tr. 117-42, 145-68, 233-42).  The Social Security

---

[1] The Administrative Transcript appears in ECF Doc. 12.

Administration denied Parham's applications initially and upon reconsideration.  (Tr. 117-69).

Parham requested an administrative hearing.  (Tr. 193-200).  ALJ William Leland heard

Parham's case on March 12, 2018, and denied the claim in an August 1, 2018, decision.  (Tr. 14-

33).  On August 9, 2019, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-7).  On September 26, 2019, Parham

filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

### III.  Evidence

#### A.  Personal, Educational, and Vocational Evidence

Parham was born on February 17, 1972, and she was 39 years old on the alleged onset

date.  (Tr. 233).  She had an 11th Grade education and never got a GED.  (Tr. 43).  She had prior

relevant work experience as a housekeeper/cleaner.  (Tr. 27, 66).

#### B.  Relevant Medical Evidence

##### 1.  Physical Health Treatment Records

On February 17, 2020, Gary Chen, MD, noted that diagnostic imaging showed moderate

narrowing at the patellofemoral compartment with spurring after Parham had reported left knee

pain.  (Tr. 372)  Vincent Chan, MD, noted that diagnostic imaging did not show any deep vein

thrombosis in Parham's leg.  (Tr. 373).

Examinations by Diane Corniceli, MD, on September 6, 2013 and by Thomas Higgins,

MD, on June 30, 2014 showed that Parham had normal range of motion, mood, affect, and

behavior.  (Tr. 343, 348).

On December 5, 2014, Christopher Conti, MD, examined Parham and noted that she had

normal range of motion, muscle tone, mood, affect, coordination, behavior, judgment, and

thought content.  (Tr. 341).

On April 21, 2016, Parham told Allison Gansel, PA-C, at the emergency department that she'd had neck pain for two months and felt "very tense" and stressed.  (Tr. 331).  Parham said that her work required her to drive a truck, weed whack, and carry a leaf blower on her shoulders.  (Tr. 331).  She said that Motrin provided "minima[l] relief."  (Tr. 331).  On examination, Gansel noted that Parham had normal range of motion, full passive range of motion without neck pain, normal strength, and normal gait.  (Tr. 332-33).  Parham had some tenderness in her cervical spine.  (Tr. 333).  Parham also had normal affect, speech, and behavior.  (Tr. 333).  Gansel further noted that diagnostic imaging showed degenerative disc disease at C5 and C6, and Parham had a potential for muscle spasm in her spine.  (Tr. 333).  Gansel gave Parham Toradol and Flexeril, which relieved her pain.  (Tr. 333).

On May 3, 2016, Parham saw Joseph Labastille, MD, for a follow-up from her emergency department visit.  (Tr. 403, 466).  Parham reported that her pain had improved with a Toradol injection, but she still had neck pain.  (Tr. 403-04, 466-67).  On examination, Dr. Labastille noted no edema, no cervical adenopathy, normal mood, and normal affect.  (Tr. 406).  Dr. Labastille continued Parham's medications.  (Tr. 406).

On June 16, 2016, Parham told Sasha Yurgionas, MD, that she had muscle stiffness, spasms in her neck, and hypertension.  (Tr. 648).  Parham denied having any joint pain.  (Tr. 648).  On examination, Dr. Yurgionas noted that Parham had tenderness in her spine, spasms in her cervical back, and normal range of motion.  (Tr. 649).  Parham also had normal mood and affect.  (Tr. 649).  Dr. Yurgionas prescribed pain medications and topical inflammation medication, and she referred Parham to physical therapy.  (Tr. 649).

On July 9, 2016, Parham told Jaclyn Sykes, RN, that she had pain in her shoulders and neck related to a pinched nerve and arthritis that arose in April 2016.  (Tr. 329).  Parham said

3

that her pain was getting worse, but 800mg of ibuprofen had given her "slight relief." (Tr. 329). Parham denied any numbness and tingling. (Tr. 329). Scott Walters, PA, noted that Parham had a "slight decrease" in her neck range of motion, but she otherwise had normal range of motion, normal gait, no edema, no tenderness, normal mood, normal affect, and normal behavior. (Tr. 330). Walters prescribed Parham ibuprofen and Flexeri for her pain, and he directed Parham to follow up with her primary care physician. (Tr. 330).

On August 12, 2016, Parham went to the emergency department after having a panic attack. (Tr. 326-27). Parham told Kristi Canzano, PA-C, that she had mild stress and elevated blood pressure due to stress at home. (Tr. 326-27). Parham said that she just wanted to go home and rest after sitting in the emergency department waiting room. (Tr. 327). On examination, Canzano noted that Parham had normal range of motion and had taken her medications outside of her schedule. (Tr. 328). Canzano prescribed lisinopril and Klonopin. (Tr. 328).

On August 16, 2016, Parham again told Dr. Yurgionas that she had muscle stiffness, muscle spasms, and hypertension. (Tr. 399, 461). Parham noted that she had gone to the emergency department after a panic attack and that she was given lisinopril. (Tr. 399, 461). Parham said that she felt better without treatment after going through the "mental exercise of waiting" to see the doctor. (Tr. 399, 461). Parham denied having any joint pain. (Tr. 399, 462). On examination, Dr. Yurgionas noted Parham had some tenderness and spasms in her back, but she had normal cervical range of motion, normal mood, and normal affect. (Tr. 400, 462). Dr. Yurgionas prescribed topical medication for Parham's pain, recommended she use a heating pad on her neck, and referred her to physical therapy. (Tr. 400-01, 463). At a follow-up on November 15, 2016, Parham denied having any back pain or myalgias and examination showed no musculoskeletal issues. (Tr. 811-12). On March 23, 2017, Parham reported a tender back,

neck, and throat, and said that she had burning in her thoracic spine.  (Tr. 807).  Parham also

reported malaise and fatigue.  (Tr. 807).  Examination revealed thoracic back spasms and

cervical adenopathy, and Dr. Yurgionas diagnosed Parham with chronic midline low back pain

without sciatica.  (Tr. 808).  Dr. Yurgionas gave Parham pain medications and a Toradol

injection.  (Tr. 807-08).  At follow-ups on June 6, September 5, October 3, and December 5,

2017, Parham told Dr. Yurgionas that she had myalgias but denied having any back pain.  (Tr.

797, 802, 805, 955).  Examinations showed no musculoskeletal or neurological issues, cervical

adenopathy (only on June 6, 2017), and normal mood and affect.  (Tr. 798, 802-03, 805, 955).

On December 12, 2017, Parham also reported that she felt lonely after her daughter had left

home, felt abandoned by her case manager, and felt embarrassed about being arrested for a DUI.

(Tr. 954).

On December 14, 2017, Emily Sadri, APRN, CNM, examined Parham and noted that she

had a normal range of motion and was alert and oriented.  (Tr. 951).

### 2.    Mental Health Treatment Records

On June 30, 2014, Parham had a psychological evaluation.  (Tr. 529-32).  Parham

reported that she was never happy, had "real bad anxiety," and had panic attacks three times a

week.  (Tr. 529).  Parham said that she self-isolated, but also said that she had a "wonderful

time" when she went to a jazz festival.  (Tr. 529).  The evaluation record indicates that Parham

had difficulty controlling her emotions and anger and that she generally mistrusted others.  (Tr.

529).  Parham indicated that therapy had helped in the past.  (Tr. 529).  She also reported a

history of alcohol and crack cocaine dependence, both of which were in remission.  (Tr. 530).

She said that she had quit her job because she felt "paranoid that people didn't like her."  (Tr.

530).  The evaluation record noted that Parham was diagnosed with depressive disorder, panic

disorder, and borderline personality disorder.  (Tr. 532).  Parham was prescribed Zoloft and Lamictal for her depression and recommended for individual and group therapy.  (Tr. 539).

On November 11, 2014, Parham told Thomas Asher, MD, that she had more fatigue and had not been compliant with her mental health medication because she was afraid to take it.  (Tr. 419).

On June 15, 2015, Parham saw Nema Saleem, PC, for counseling.  (Tr. 574).  Saleem noted that Parham was tearful during the session and had a fluctuating ability to give feedback. (Tr. 574).  At a follow-up on June 16, 2015, Parham told Saleem that she had depression, anxiety, and shoulder tightness.  (Tr. 525).  She also said that she had difficulty dealing with challenges, slept three to four hours per night, would sit and cry when she went to the hospital, and sometimes had "ugly thoughts" including suicidal ideations.  (Tr. 525).  Parham reported that her lack of sleep affected her interactions with other people, that she had issues with her 19-year old son, and that "folks just walk all over [her] whenever they feel like it."  (Tr. 525). Saleem diagnosed Parham with borderline personality disorder and anxiety disorder, and she recommended Parham continue with counseling.  (Tr. 526-27).

On June 17, 2015, Parham told Carol Macknin, MD, that she'd had bad panic attacks and was unable to use coping tools that she had learned during therapy.  (Tr. 534).  Parham said that her "mood fluctuate[d] a lot."  (Tr. 534).  She said that she had history of sexual abuse by her father and boyfriends.  (Tr. 537).  Dr. Macknin noted that Parham never took the medications that were prescribed to her, and that she was "irritated very easily"  (Tr. 539).  Dr. Macknin prescribed Parham citalopram for her panic attacks and recommended individual counseling, case management, and group therapy.  (Tr. 539).

From June 26, 2015, through September 26, 2017, Parham had approximately 72 phone and in-person counseling and case management (CPST) sessions with Natalie Jernigan, LPCC/S, and Elizabeth Bailey-Grincius, PC.  (Tr. 523-33, 540-620, 712-25, 741, 750-79, 835, 875, 885, 897-928, 97).  Parham's counselling sessions generally focused on building skills to manage her anxiety, control her emotions and impulsive behavior that had contributed to her lack of sustained employment, and deal with loneliness and depression.  (Tr. 523-33, 540-620, 712-25, 741, 750-79, 835, 875, 885, 897-928, 97).  Although Parham's medication compliance and condition fluctuated throughout this period (Tr. 543, 554-55, 564, 572, 578, 580, 712, 721, 727, 741, 916), Jernigan regularly noted that Parham was actively engaged in counseling and made progress or "significant progress" in addressing her anxiety, depression, emotional regulation, motivation, and energy (Tr. 545, 550-51, 553, 557-60, 573, 575-76, 591, 595, 599, 563-64, 601-02, 605, 607, 612-13, 714-17, 720-21, 730, 750, 754, 758, 760-61, 764, 766, 771-73, 775-77, 899, 904, 910-13, 915, 919-20, 922, 977).  On February 17, 2016, Parham reported that she felt better after group therapy, and on June 29, 2016, she said that she was glad she went to group therapy.  (Tr. 560, 567, 717, 724).  On April 12, April 19, and May 19, 2016, Parham reported that she had adjusted to her new job; was able to find balance in her work, rest, and physical activity; successfully managed an embarrassing moment at work; and intended to resume medication compliance to help with her mood management.  (Tr. 562-64, 719-21).  On October 10, 2016, Jernigan noted that Parham was implementing skills she had learned during counseling and demonstrated improved self-respect, effectiveness, and motivation.  (Tr. 773).  On November 18, 2016, Jernigan noted that Parham had full affect, was able to go to work daily, and rode her bike for exercise.  (Tr. 777).  And on September 1 and 22, 2017, Jernigan noted that Parham had improved her fatigue, had increased self-awareness, was able to communicate her

needs, effectively balanced her work responsibilities, implemented strategies for dealing with her cognition, and understood how to apply her coping skills.  (Tr. 885, 920).

On July 1, 2015, Parham saw Kathleen Christy, NP, for medication management.  (Tr. 617).  Parham said that she was compliant with her medications, but she felt like she did not have any energy, slept only two to three hours per night, and isolated from people.  (Tr. 617).  Christy adjusted Parham's medications.  (Tr. 618).

On August 11, 2015, Parham told Dr. Macknin that she did not think her medication helped and she had run out of it.  (Tr. 621).  Parham said that she could not tolerate being in a room with other people.  (Tr. 621).  Dr. Macknin adjusted her medications.  (Tr. 622).  On September 15, 2015, Parham reported that she had continued anxiety spells and panic attacks, and on November 17, 2015, she said that she had not taken her medications "for a long time." (Tr. 623, 627).  On December 8, 2015, Parham said that she was crying often and was disappointed after she was denied a job she had applied for.  (Tr. 629).  On January 5, 2016, Parham told Dr. Macknin that she continued to feel depressed, lonely, and occasionally suicidal, but she had a friend visit her, read books, and watched TV.  (Tr. 631, 778).  Dr. Macknin noted that Parham had "mild" OCD symptoms related to germs and adjusted her medications.  (Tr. 631-32, 778-79).

On February 23, 2016, Parham told Benjamin Tishman, DO, that she had anxiety, depression, and elevated blood pressure.  (Tr. 334).  Dr. Tishman noted that Ativan had helped with Parham's anxiety, and examination showed normal speech, anxious/depressed mood, and no anger, aggression, or agitation.  (Tr. 335).  Dr. Tishman stated that Parham was stable during the exam and advised her to take her medications as prescribed.  (Tr. 335).

8

On March 1, 2016, Parham told Dr. Macknin that she had not eaten for 5 days, had difficulty sleeping, and sleepwalked.  (Tr. 634, 781).  Dr. Macknin noted that Parham was only "partial[ly]" compliant with her medications and adjusted her medications.  (Tr. 635, 782).  At a follow-up on June 29, 2016, Parham said that she quit a job she had gotten with the city because working full time was too much pressure, she got a cleaning job afterwards, and she quit that job, too.  (Tr. 638, 785).  Dr. Macknin again adjusted Parham's medications.  (Tr. 639, 786).  On September 20, 2016, Parham told Dr. Macknin that her medications worked "fairly well," she was sleeping well, and she kept track of her moods on her calendar.  (Tr. 641, 788).

From October 21, 2016, through January 22, 2018, Parham had approximately 65 phone and in-person case management (CPST) sessions with Kelly Kostandaras, QMHS, and cancelled numerous other scheduled case management sessions.  (Tr. 732-48, 824-34, 836-96, 965-76).  Parham's case management sessions generally focused on helping Parham grocery shop, fill out paperwork and apply for jobs, obtain housing vouchers, get a refund for a car she had purchased, and prepare for court after her August 2017 DUI arrest.  (Tr. 732-48, 824-34, 836-96, 965-76).  On January 13, 2017, Kostandaras noted that Parham had "successfully managed [her] own anxiety symptoms during [their] shopping trip and obtained all of the items [she] needed for the month."  (Tr. 862).  On May 18, 2017, Parham informed Kostandaras that she was able to get her job back after she had been laid off, and that she had bought a new car on her own.  (Tr. 849).  On August 2 and 8, 2017, Parham said that she felt that all her work and treatment was "paying off" because she was getting out of bed in the morning and being productive each day, and that her new job was going well.  (Tr. 871-72).  On September 13, 2017, Parham said that she was working with an altered work schedule, and she loved it.  (Tr. 882).  And on November 10, 2017, Parham reported that she was happy and was able to minimize her anxiety symptoms.  (Tr. 966).

9

On November 1, 2016, Dr. Macknin noted that Parham was "very emotionally reactive to her environment," but she was compliant with medications and had made "some progress." (Tr. 790-91).  On January 18, 2017, Dr. Macknin again noted that Parham had made progress and continued her medications.  (Tr. 930).  On February 15, 2017, Dr. Macknin noted that Parham was tearful during her visit and was afraid to take a week off work because she thought she would lose her job.  (Tr. 931)  On examination, Parham was anxious, depressed, and fatigued. (Tr. 931).  Parham also reported drinking a bottle of wine weekly to keep calm, and Dr. Macknin recommended she seek therapy to address her drinking.  (Tr. 931-32).  On March 14, 2017, Parham told Dr. Macknin that she wanted to move because she felt like her living environment was too noisy, and Dr. Macknin continued her medications and therapy recommendation.  (Tr. 933-94).  On May 16, 2017, Parham told Dr. Macknin that she had lost her job and had been spending her time lying in bed watching movies and "thinking about what to do next."  (Tr. 935). Parham said that she did not trust anyone, and she was offered a job at a hospital.  (Tr. 935).  On August 30, 2017, Parham said she was frustrated about not being able to find work, getting a DUI, and her son being in jail.  (Tr. 938).  Parham told Dr. Macknin that she believed she "should be married, have a boyfriend, [and] have a career."  (Tr. 938).  Dr. Macknin adjusted Parham's medications and recommended that she continue with counseling and case management.  (Tr. 939).

On October 30, 2017, Parham told David Kwon, NP, that "[e]verything is shitty" and she was often angry or frustrated.  (Tr. 943).  Parham sad that she had daily anxiety and sometimes thought about killing herself.  (Tr. 943).  She also said that she worked 20 hours per week and had insomnia on days she didn't work.  (Tr. 943).  Kwon continued Parham's medications and referred her for counseling and case management.  (Tr. 944).

10

C.      **Relevant Opinion Evidence**

1.      **Case Manager's Opinion – Kelly Kostandaras, QMHS**

On January 30, 2018, case manager Kostandaras completed a third-party function report. (Tr. 313-20).  Kostandaras noted that she had known Parham for two years and worked with her once or twice a week.  (Tr. 313).  She indicated that Parham often would not get out of bed due to depression and had severe anxiety symptoms.  (Tr. 313).  Kostandaras said that Parham's symptoms limited her ability to work and affected her sleep.  (Tr. 313-14).  Parham could use an oven or microwave, prepare complete meals, and make sandwiches.  (Tr. 315).  Her chores included cleaning and laundry, and she went outside once or twice a week.  (Tr. 315-16). Parham could walk, use public transportation, go outside alone, shop for groceries, pay her bills, count change, and use a checkbook.  (Tr. 316).  Kostandaras said that Parham talked on the phone to other people daily, and that she needed to be reminded to go places weekly.  (Tr. 317). Kostandaras said that Parham lashed out at others and was angry, and that her symptoms caused her to go out less than she had before.  (Tr. 318).  Her symptoms also affected her understanding, memory, talking, completion of tasks, ability to get along with others, and concentration.  (Tr. 318).  Kostandaras opined that Parham could pay attention for 10 minutes before getting angry, and that she was often argumentative or "wing[ed] it" instead of following instructions.  (Tr. 318).  Kostandaras said that Parham did not handle stress, authority figures, or changes in routine well.  (Tr. 319).

2.      **State Agency Consultants' Opinions**

On September 30, 2016, state agency psychology consultant Bruce Goldsmith, Ph.D., assessed Parham's mental impairments based on a review of the record.  (Tr. 122-23, 126).  Dr. Goldsmith determined that Parham had the medically determinable mental impairments of

affective disorders and anxiety disorders, and also evaluated her for substance addiction disorders.  (Tr. 122).  Dr. Goldsmith determined that Parham did not have an impairment or combination of impairments that met or medically equaled the listings associated with those disorders, because she had only: (1) mild restrictions in her daily living activities; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation of extended duration.  (Tr. 123).  She also did not meet any of the criteria under Paragraph C of the listings.  (Tr. 123).  Based on his review of the medical record, Dr. Goldsmith stated that Parham had:

> the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  She can perform work that does not require commercial driving or exposure to hazards such as unprotected heights or industrial machinery due to her alcoholism.  She is limited to simple, routine, repetitive tasks, with easily explainable changes, which is performed at a predictable pace and does not involve high quotas or productivity demands.  It should require no more than occasional and superficial interaction with the public or coworkers.

(Tr. 126).  On December 30, 2016, Courtney Zeune, Psy.D., concurred with Dr. Goldsmith's assessment.  (Tr. 150, 153-54).

On September 30, 2016, state agency consultant Anne Prosperi, D.O., assessed Parham's physical functions based on a review of the medical records.  (Tr. 124-26).  Dr. Prosperi determined that Parham could lift up to 50 pounds occasionally and 25 pounds frequently.  (Tr. 125).  She could stand or walk for up to 6 hours in an eight-hour day and sit for up to six hours in an eight-hour day.  (Tr. 125).  She could occasionally crawl and climb ladders, ropes, or scaffolds.  (Tr. 125).  She had no other postural limitations.  (Tr. 125).  She also did not have any manipulative, visual, communicative, or environmental limitations.  (Tr. 125-26).  On December 29, 2016, Dimiri Teague, M.D., concurred with Dr. Prosperi's assessment, noting also that Parham had complained of neck pain, muscle spasms, and degenerative disc disease at C5-C6,

but her exams showed normal gait, normal strength, intact sensation, and normal to slightly decreased neck range of motion.  (Tr. 151-53).

### D.  Relevant Testimonial Evidence

Parham testified at the ALJ hearing.  (Tr. 40-64).  Parham said that she lived with her 20-year-old daughter, who had moved out for college.  (Tr. 41).  She did not have a driver's license because it was suspended after she got a DUI.  (Tr. 42).  Parham said that she was on probation for her DUI and complied with all her PO's instructions.  (Tr. 46).  Parham rode the bus often, but she only stood on the bus because sitting on it gave her anxiety.  (Tr. 43).  If her destination involved transfers, she usually had her case worker take her.  (Tr. 43).  Parham said that her weight had fluctuated due to stress, anxiety, and her medicine.  (Tr. 41-42).  Parham said that she used to have "a lot of little support" from friends, but people got tired of seeing her in a mood. (Tr. 53).  She said that her family was "the center," and she went there about three to five times a week.  (Tr. 53-54).  Parham said that she went to group every Monday and Thursday with "the AOD lady from probation," and just stayed "walled up in [her] room" at all other times.  (Tr. 54). She said that her ability to concentrate was not good, and that school lessons were too fast for her to understand.  (Tr. 55).  She had a Facebook page that her daughter set up and a phone, but she had limited ability to use them.  (Tr. 55).  She could count money.  (Tr. 55).  She said that she did chores, including washing dishes, laundry, dusting, vacuuming, and mopping with her daughter when she came home, and that she could make a sandwich or cook something in a microwave.  (Tr. 55-56, 61).

Parham testified that she last worked as a seasonal employee at Jakprints until a month and a half before the ALJ hearing.  (Tr. 44-45).  She worked 25 hours per week folding shirts, and she did not interact with anyone other than supervisors.  (Tr. 44-46).  Parham had also been

13

self-employed as a housekeeper in 2007 and got her business through client referrals.  (Tr. 47, 49).  In that role, Parham would clean clients' closets, vacuum, and mop.  (Tr. 49).  She would lift "a little bit more over 25 pounds."  (Tr. 50).  Parham said that she had also worked as a laborer for Tri-County Electrician.  (Tr. 48).

Parham testified that she believed she could not work because she had anxiety, "a lot of tightness," muscle spasms, and "humps on [her] back."  (Tr. 50).  Parham said she had anxiety when she was around "[n]ew stuff, strangers, and different types of work orders."  (Tr. 50).  She said that she was uncomfortable being around other people and being "out."  (Tr. 50).  When she had anxiety, she felt sick and embarrassed, and she wasn't able to get along with other people. (Tr. 51).  Sometimes, when she "g[o]t into a space," she stopped taking showers and brushing her teeth.  (Tr. 53).  She also had trouble eating when she was stressed.  (Tr. 62).  Parham said that her mental issues were the main cause of her inability to work, but she also had muscle spasms and could not stand or be on her feet for work.  (Tr. 52).  She said her muscle spasms occurred when she was tense or stressed.  (Tr. 52).  She would have cramps and pain when she had anxiety from activities like riding the bus and grocery shopping.  (Tr. 60).

Parham said that she didn't get her medication often, and that her pharmacy had to write on the medication in bubble packs for her to take it.  (Tr. 53).  She said she was embarrassed because she was "supposed to know how to take [her] medicine," but had to return to the pharmacy for instructions.  (Tr. 53).  She also had trouble sleeping due to her medications.  (Tr. 58).  Parham said that she had to adjust her medication often when she first started it, but it helped her, and she could not have gone to the hearing without it.  (Tr. 56).  She said that she wanted to work, and she would need her medicine to be able to go to work.  (Tr. 57).  Parham said that, with treatment, she was able to better-develop an ability to communicate how she felt

so people could understand her.  (Tr. 57).  Parham also said that volunteering – moving chairs "at

the arcade" and interacting with "just a couple people" – helped her feel better.  (Tr. 58).

      Gene Burkhammer, a vocational expert ("VE") also testified.  (Tr. 64-71).  The VE said

that Parham's past cleaning work would be classified as "housekeeping, cleaner" and was light

work as defined and performed.  (Tr. 66).  The ALJ asked the VE whether a hypothetical

individual with Parham's experience, education, and age could work if she were limited to:

> medium [exertion], occasional climbing of ladders, ropes, and scaffolds,
> occasional crawl.  Never to be exposed to unprotected heights, or moving
> mechanical parts, or operate a motor vehicle.  Her mental limitations include,
> limited to simple, routine, competitive tasks, with easily explainable changes,
> which is performed at a predictable pace, and does not involve high quotas, or
> high productivity demands.  It should require no more than occasional and
> superficial interactions with the public or coworkers.

(Tr. 66-67).  The VE said that such an individual could perform Parham's past work as generally

and actually performed.  (Tr. 67).  The VE said that such an individual could also perform such

representative occupations as "order puller," "laundry laborer," or "kitchen helper."  (Tr. 67-68).

The ALJ asked if the individual described above could work with the following RFC

modifications:

> Deleting the mental limitations . . . described in hypothetical number one and
> replacing them with the following: limited to performing simple, routine, and
> repetitive tasks, but not at a production rate pace, *i.e.* assembly line work.
> Limited to simple, work-related decisions in using her judgment and dealing with
> changes in the work setting.  Able to occasionally interact with supervisors and
> coworkers, never to interact with the public.

(Tr. 68).  The VE said that the same work would be available to such an individual, though the

number of jobs available would be lower for the "housekeeping, cleaner" position. .  (Tr. 68-69).

The ALJ asked if the individual described in the second hypothetical could work if she were

limited to "no interaction" with coworkers.  (Tr. 69).  The VE said that such an individual would

not be able to perform Parham's past work or any competitive work.  (Tr. 70).  The ALJ asked if

the individuals described in the first and second hypotheticals would be able to work if, " in addition to normal work breaks, [they] would be off-task 20 percent of an eight-hour work shift, and/or absent from work two days per month." (Tr. 70). The VE said that neither individual could work with either or both limitations. (Tr. 70).

Parham's attorney asked the VE whether the ALJ's first, second, and third hypotheticals included any limitations "that would suggest the individual's sustainability was compromised." (Tr. 71). The VE agreed that no such limitations were included. (Tr. 71).

## IV.    The ALJ's Decision

The ALJ denied Parham's claims in an August 1, 2018, decision. (Tr. 17-29). The ALJ found that Parham had severe impairments of "depression; anxiety; personality disorders; degenerative disc disease at C5-6; moderate narrowing of the left patellofemoral compartment with spurring; and obesity." (Tr. 21). The ALJ also determined that Parham's impairments, singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21). Specifically, the ALJ stated:

> Particular attention was given to medical listing 1.02 for major dysfunction of a joint. However, the specified criteria required of the listing was not demonstrated by the available medical evidence. Specifically, the listing requires gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint. The listing also requires involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively as defined in 1.00B2b. In this case, the evidence does not demonstrate that the claimant has the degree of difficulty in ambulating as defined in l.00B2b.
>
> The medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04. Moreover, there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b).
>
> * * *

16

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.  A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a moderate limitation.  At the hearing, the claimant testified that she had an 11th grade education, with no GED.  She testified that she is forgetful, and forgets to take her medication.  She has trouble comprehending information (Hearing Testimony).

In interacting with others, the claimant has a moderate limitation.  At the hearing, the claimant testified that she has anxiety.  She has back spasms due to her anxiety.  Her anxiety is triggered by being out in public, being in unfamiliar places, or being around strangers.  Being overly anxious makes her vomit.  Her anxiety embarrasses her.  She stated that her friends do not want to be around her anymore.  She is nervous at appointments, and she grocery shops quickly (Hearing Testimony).

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  At the hearing, the claimant testified that her concentration and focus were poor (Hearing Testimony).

As for adapting or managing oneself, the claimant has experienced a mild limitation.  At the hearing, the claimant testified that she lived with her 20-year-old daughter.  She is able to take public transportation.  When she is depressed, she sometimes does not take care of her personal hygiene.  She is able to microwave food or make simple sandwiches (Hearing Testimony).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  There is no indication that the claimant's impairments cause marginal adjustment. Although she noted significant anxiety, she is still

able to take public transportation, grocery shop, and make simple meals.  There is no indication that increased stress or change would cause decompensation.

(Tr. 21-23).

The ALJ determined that Parham had the RFC to perform a reduced range of medium work, except that she could:

> occasionally climb ladders, ropes, or scaffolds and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; she is limited to simple, routine, repetitive tasks, with easily explainable changes, which is performed at a predictable pace and does not involve high quotas or productivity demands; and work that requires no more than occasional and superficial interaction with the public or coworkers.

(Tr. 23).  In assessing Parham's RFC, the ALJ noted that he "considered all symptoms" in light of the medical and other evidence.  (Tr. 23).  The ALJ discussed Parham's subjective complaints regarding her symptoms and limitations, but determined that, although her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 23-24).  The ALJ extensively discussed the physical treatment records and found that "although the record reflects some musculoskeletal issues as well as obesity, there is no evidence that these impairments preclude [Parham] from working."  (Tr. 24).  Further, the ALJ discussed the mental treatment records in detail, and found that, although Parham "struggled with depression and anxiety . . . there [was] no indication that she could not perform work within the above residual functional capacity."  (Tr. 24-26).  Finally, the ALJ noted that he gave "great weight" to the state agency consultants' physical and mental RFC assessments, and that he found Case Manager Kelly Kostandaras's third party function report to be inconsistent with other evidence in the record.  (Tr. 26-27).

Based on the VE's testimony – that Parham could perform her past work as a "housekeeping, cleaner" in light of the ALJ's RFC assessment – the ALJ found that Parham was not disabled from January 10, 2012, through the date of his decision.  (Tr. 28-29).  Further, as an alternative holding, the ALJ relied on the VE's testimony – that Parham could work as an "order puller, laundry laborer, and kitchen helper" – in finding that Parham was not disabled because she could also adjust to other work in the national economy.  (Tr. 27-28).  Accordingly, the ALJ denied Parham's claims for DIB and SSI.  (Tr. 28).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers v. Comm'r of Soc.*

*Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778,

783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so

because the Commissioner enjoys a "zone of choice" within which to decide cases without being

second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

decisions of administrative agencies for harmless error.").  Furthermore, the court will not

uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.*

*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a

reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

20

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the

national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r*

*of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although the Commissioner has the burden

of proof at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to

prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.     Listings Determination

Parham argues that the ALJ failed to properly evaluate and consider whether she had an

impairment, or combination of impairments, that met or medically equaled Listings 1.02, 1.04,

12.04, 12.06, or 12.08.  ECF Doc. 13 at 10-13.  Parham asserts that, in considering Listings 1.02

and 1.04, the ALJ improperly focused on whether she could ambulate effectively and neglected

to consider whether she could stand for six hours in a workday or had limitations in her ability to

handle and finger.  ECF Doc. 13 at 10.  As to Listings 12.04, 12.06, and 12.08, Parham argues

that the ALJ's written decision did not clearly show what evidence the ALJ relied upon in

determining that she did not meet Paragraph B criteria.  ECF Doc. 13 at 10-11, 13.  Further,

Parham argues that, in evaluating whether she met Paragraph C criteria, the ALJ did not

adequately consider that her regular need for case management demonstrated that she: (1) needed

medical treatment and support to diminish her symptoms; and (2) had only a minimal capacity

for adaptation/adjustment.  ECF Doc. 13 at 11-12.  Therefore, Parham argues that the ALJ's

listings analysis failed to build an accurate and logical bridge between the evidence and the denial of her claim.  ECF Doc. 13 at 13.

The Commissioner responds that the ALJ did not err in concluding that Parham did not have an impairment or combination of impairments that met or medically equaled a Listing. ECF Doc. 16 at 11-22.  The Commissioner argues that the ALJ appropriately considered all the evidence – including Parham's knee and spine x-rays, notes that she had a normal gait and normal range of motion, records establishing on mild or moderate spine issues, the absence of any opinion finding listing-level impairments, and her representative's concession that she did not meet a physical impairment listing – pursuant to the criteria of Listings 1.02 and 1.04.  ECF Doc. 16 at 13-15.  Further, the Commissioner asserts that Parham's argument that the ALJ should have focused his listing analysis on whether she could stand for eight hours per day or had limitations in handling and fingering is unavailing because neither of those issues is a criterion under Listings 1.02 and 1.04.  ECF Doc. 16 at 15-16.  The Commissioner also contends that the ALJ reasonably determined that Parham did not meet the criteria of Listings 12.04, 12.06, and 12.08 after considering the evidence in the record – including Parham's 11th grade education, her testimony that she was forgetful and had comprehension/memory problems, her testimony that she had anxiety in public and that friends did not want to be around her, her testimony that her concentration was "not good," and the reports from Parham's case worker. ECF Doc. 16 at 18-21.

Parham's reply brief reiterates her position that the ALJ failed to adequately consider her case management notes, which she says indicated substantial difficulties in performing daily living activities.  ECF Doc. 17 at 2-3.  She asserts that the record shows she did not make progress and continued to have difficulties with her emotions.  ECF Doc. 17 at 3.

At Step Three, a claimant has the burden to show that she/he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

### 1.    Listings 1.02 and 1.04

The Listing 1.04 considers whether the claimant has a "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion

of the affected joints." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.02.  Such impairments must be

supported by "findings on appropriate medically acceptable imaging of joint space narrowing,

bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. pt. 404, Subpt. P, App. 1

§ 1.02.  Further, the claimant must show:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.02.  The Listing 1.04 considers whether the claimant's

spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04.  To be unable to effectively ambulate, a claimant

must have "an extreme limitation of the ability to walk." 20 C.F.R. pt. 404, Subpt. P, App. 1

§ 1.00B2b(1).  To be unable to perform fine and gross movements effectively, a claimant must

have "an extreme loss of function of both upper extremities." 20 C.F.R. pt. 404, Subpt. P, App.

1 § 1.00B2c.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in concluding that Parham did not limitations that, singly or in combination, met or medically equaled Listings 1.02 or 1.04.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d 234, 241.  Here, the ALJ complied with the regulations by actually evaluating the evidence, comparing the limitations supported by that evidence with the requirements under both Listings 1.02 and 1.04, and explaining that the evidence did not show: (1) limited motion in any of the joints affected by space narrowing or bony destruction or the involvement of a major peripheral weight-bearing joint resulting in an inability to walk as required under Listing 1.02(A); or (2) nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required under Listing 1.04.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 1.02(A), 1.04.  Further, Parham's argument that the ALJ erred by not evaluating her ability to sit for six hours or perform handling and fingering in determining whether she met these limitations is unavailing.  Because none of the physical treatment or testimonial evidence in the record indicated that Parham's upper extremities were affected or that she had symptoms limiting her ability to perform fine and gross movements, the ALJ was not required to consider whether Parham met the criteria of Listing 1.02(B).  *Sheeks*, 544 F. App'x at 641; 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.02(B); *see generally* (Tr. 326-33, 341, 343, 348, 372-73, 399-406, 461-63, 466-67, 648-49, 797, 802-08, 811-12, 951, 954-55).  Listing 1.04 does not include handling and fingering criteria.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04.  And neither Listings 1.02 nor 1.04 include as a criterion whether a claimant can sit for up to six hours.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 1.02, 1.04.  Moreover, substantial evidence supported the ALJ's conclusion that Parham did not have listings-level physical limitation, including: (1) regular findings that she had normal range of motion, normal muscle tone, normal strength, normal gait, full passive range of motion, no

edema; no tenderness;  (2) Parham's own comments denying any joint pain, numbness, and tingling; and (3) her ability to effectively treat any pain or inflammation with ibuprofen and topical anti-inflammatory medications.  (Tr. 328-33, 341, 343, 348, 399-400, 406, 462, 649, 798, 802-03, 805, 811-12, 951, 955).

Because substantial evidence supported the ALJ's finding that Parham did not satisfy the severity criteria of Listings 1.02 or 1.04, that decision fell within the Commissioner's "zone of choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15.  Accordingly, the ALJ's conclusion that Parham physical impairments, singly or in combination, did not meet or medically equal the severity criteria of Listings 1.02 or 1.04 must be affirmed.

### 2.      Listings 12.04, 12.06, and 12.08

Listing 12.04 establishes the criteria for depression and bipolar disorder; Listing 12.06 establishes the criteria for anxiety-related disorders; and Listing 12.08 establishes the criteria for personality and impulse-control disorders.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.08.  To meet these listings, a claimant must have medical documentation of one of the qualifying mental disorders with certain severity thresholds as defined under Paragraph A of each listing.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.08.  The claimant must also show that she meets the criteria of Paragraph B – an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself."  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B), 12.08(B).  As an alternative to the Paragraph B criteria, a claimant may instead meet Listings 12.04 and 12.06 by demonstrating that she meets criteria under Paragraph C.  20 C.F.R. pt. 404, Subpt. P, App. 1

§§ 12.04(C), 12.06(C); *but see* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.08 (lacking Paragraph C

criteria).  To meet Paragraph C, a claimant must show that she had a:

> Medically documented history of the existence of the disorder over a period of at
> least 2 years, and there is evidence of both: (1) medical treatment, mental health
> therapy, psychosocial supports), or a highly structured setting(s) that is ongoing
> and that diminishes the symptoms and signs of [the] mental disorder; and
> (2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to
> changes in [his] environment or to demands that are not already part of [his] daily
> life.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C).

The ALJ applied proper legal standards and reached a conclusion supported by

substantial evidence in finding that Parham's impairments, singly or in combination, did not

meet or medically equal the criteria of Listings 12.04, 12.06, or 12.08.  42 U.S.C. §§ 405(g),

1383(c)(3); *Rogers*, 486 F.3d 234, 241.  The ALJ complied with the regulations by explaining

that Parham did not meet Listings 12.04, 12.06, and 12.08 because: (1) evidence in the record

showed that she had only mild to moderate limitations in the Paragraph B criteria; and (2) no

evidence established the marginal adjustment or highly structured setting therapy required under

Paragraph C.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.08; *Reynolds*, 424 F.

App'x at 416; (Tr. 22-23).  Here, Parham's arguments – that the ALJ did not clearly show what

evidence he relied upon in evaluating whether she met one of the mental impairment listings or

sufficiently consider her case management records – is unavailing.  In laying out his reasons for

finding that she had only moderate or mild limitations in the Paragraph B criteria, the ALJ

specifically cited Parham's hearing testimony.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B),

12.06(B), 12.08(B); (Tr. 22-23).  Further, in evaluating Parham's RFC, the ALJ explained that

Parham's testimony regarding the intensity, persistence, and limiting effects of her symptoms

was inconsistent with medical records and provided a detailed summary of her mental health

records.  (Tr. 23-26).  And, in doing so, the ALJ specifically discussed and cited Parham's case

management (CPST) records.  *See* (Tr. 24-26) (specifically referring to case management records

showing that Parham was able to apply for temporary work, said she was doing better and was

happier after finding a job, and navigated such setbacks as returning a car she regretted leasing

and getting a DUI).  Even though the ALJ did discuss Parham's case management records in the

section of his written decision addressing the Listings, when the ALJ's decision is read as a

whole it is clear that the ALJ: (1) expressly considered Parham's case management records; and

(2) concluded that those records did not establish the severe marginal adjustment required under

Paragraph C.  *See Malone v Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012)

(holding that an ALJ complied with the regulations when he expressly found that the claimant

did not satisfy Listings criteria and "considered all of the symptoms that were consistent with the

medical evidence in determining his residual functional capacity"); *see also Buckhanon ex rel.

J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a

whole and with common sense."); (Tr. 22-26).

Substantial evidence also supported the ALJ's conclusion that Parham did not meet

Paragraph B or Paragraph C criteria, including: (1) Examination findings that Parham had

normal mood, affect, behavior, judgment, and thought content; (2) mental health treatment and

case management notes regularly indicating that Parham was actively engaged and made

progress or "significant progress"  in addressing her anxiety, depression, emotional regulation,

motivation, and energy; (3) mental health treatment and case management notes indicating that

Parham had implemented coping skills she had learned, demonstrated improved motivation and

an ability to go to work daily and successfully managed her own anxiety while grocery shopping;

(4) Parham's statements to providers that she had been able find and adjust to jobs, that she was

28

happy or felt better when working, that she felt her treatment was "paying off," and that her medications and therapy helped her symptoms; (5) Dr. Goldsmith's and Dr. Zeune's opinions that Parham had only mild restrictions in daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration/persistence/pace, and no episodes of decompensation; and (6) Parham's testimony that she was able to adjust to a temp job, was able to maintain referral clients for her own housekeeping business, that her medication helped when she took it, that therapy helped her develop her ability to communicate effectively, and that volunteer work made her feel better. (Tr. 44-49, 56-58, 330, 341, 343, 348, 400, 406, 462, 529, 539, 545, 550-51, 553, 557-60, 573, 575-76, 591, 595, 599, 560, 562-64, 567, 601-02, 605, 607, 612-13, 641, 649, 714-17, 719-21, 724, 730, 750, 754, 758, 760-61, 764, 766, 771-73, 775-77, 788, 798, 802-03, 805, 862, 871-72, 882, 885, 899, 904, 910-13, 915, 919-20, 922, 955, 966, 977).  Parham cites records indicating a different conclusion could have been reached, and that may well be.   But it is well settled that the existence of evidence that supports a claimant's position does not preclude an ALJ from concluding that contrary evidence better characterizes the claimant's limitations.  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15

Because the ALJ cited substantial evidence supporting his finding that Parham did not satisfy the severity criteria of Listings 12.04, 12.06, and 12.08, that decision fell within the Commissioner's "zone of choice" and cannot be overturned by this court. *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15.  Accordingly, the ALJ's conclusion that Parham's mental impairments, singly or in

combination, did not meet or medically equal the severity criteria of Listings 12.04, 12.06, and 12.08 must be affirmed.

### C.    Prior Work

Parham next argues that the ALJ erred in finding that she was able to perform her past work as a housekeeping cleaner.  ECF Doc. 13 at 13-15.  Specifically, Parham asserts that the VE's testimony indicates she could not perform her past work because the VE testified that an individual who was limited to no interaction with coworkers could not perform *any* work.  ECF Doc. 13 at 14.  Parham contends that, based on the VE's testimony, the ALJ should have found that she was disabled.  ECF Doc. 13 at 14.  The Commissioner does not specifically respond to this argument, noting that Parham's "argument is really centered on the ALJ's determination that she was limited to no more than occasional and superficial interaction with coworkers, rather than no such interaction."  ECF Doc. 16 at 24 n.10.

At Step Four, the claimant has the burden to establish that she is unable to perform her past relevant work in light of her RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *see also Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (explaining that a claimant challenging a finding that she was able to perform past relevant work had "fail[ed] to provide [the court] with the factual record [the court] need[ed] to find in her favor").  In evaluating whether a claimant can perform her past relevant work, the ALJ must compare the requirements of the claimant's past work with her RFC to determine whether she can still meet the physical and mental demands of that work.  20 C.F.R. §§ 404.1560(b), 416.960(b).  Relevant evidence includes: (1) the claimant's vocational documentation; (2) the claimant's statements about her past work requirements and why she believes she can no longer perform them; (3) medical evidence in the record; and (4) "supplementary or corrobatorive information from

other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy."  SSR 82-62, 1982 SSR LEXIS 27, at *6-7 (1982); 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).  VE testimony is also an important resource, and a "response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairments can meet the demands of the claimant's previous work" may be substantial evidence supporting a conclusion that the claimant can perform her past relevant work.  20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (A VE's testimony in response to a hypothetical question is substantial evidence if the hypothetical accurately reflected the claimant's RFC as found by the ALJ); *cf. Wright-Hines*, 597 F.3d at 396 (noting that an ALJ has an "inquisitorial duty to seek clarification on material facts" in evaluating a claimant's ability to perform past relevant work).

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in finding that Parham's could perform her past relevant work as a "housekeeping, cleaner." 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d 234, 241.  The ALJ complied with the regulations when he considered Parham's vocational documentation, her statements regarding her past work requirements and why she believed she could no longer perform them, and the medial evidence.  SSR 82-62, 1982 SSR LEXIS 27, at *6-7 (1982); 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); (Tr. 23-28).  Further, the ALJ satisfied his "inquisitorial duty to seek clarification on material facts" by asking the VE: (1) how Parham's past relevant work would be classified; and (2) whether a hypothetical individual with Parham's RFC, age, and experience could perform that past relevant work as generally and actually performed.  *Wright-Hines*, 597 F.3d at 396; 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); (Tr. 23,

27-28, 66-70).  And, because the ALJ's hypothetical question to the VE tracked his RFC findings, the VE's testimony that such an individual would be able to perform Parham's past relevant work as a "housekeeping, cleaner" was substantial evidence supporting the ALJ's conclusion that Parham could perform her past relevant work.  *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); (Tr. 27-28).  Here, Parham's argument – that the VE's testimony did not support the ALJ's conclusion when the VE had also said that she could not work if she were limited to *no interaction* with coworkers – is unavailing because the ALJ found that Parham could interact with coworkers but was limited to "occasional and superficial" interaction.  Thus, the ALJ was not required to incorporate a "no interaction" limitation into the RFC.  Further, the ALJ was not required to base his conclusions on any VE testimony that responded to such a hypothetical limitation.  *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (holding that "[a]n ALJ is only required to incorporate into a hypothetical question those limitations he finds credible," and that a response to a hypothetical is substantial evidence only when the hypothetical accurately portrayed the claimant's RFC).

Because substantial evidence supported the ALJ's finding that Parham was able to perform her past relevant work as a "housekeeping, cleaner," that decision fell within the Commissioner's "zone of choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15.  Accordingly, the ALJ's conclusion that Parham could perform her past relevant work must be affirmed.

### D.    RFC Finding

Parham also implies, in her prior-work argument, that the ALJ's RFC finding should have included a limitation that she was limited to no interaction with coworkers, based on

"treatment notes from The Centers for Families and Children."  ECF Doc 13 at 14.  She also

states that "there was the question of whether her knee problem precluded her from

standing/walking six hours a day."  ECF Doc. 13 at 14.

The Commissioner responds that the ALJ did not err in evaluating Parham's physical and

mental RFC.  ECF Doc. 16 at 22-25.  First, the Commissioner asserts that Parham's perfunctory

challenge to the physical RFC findings should be deemed waived because she merely asserted

that there was "a question" regarding her physical limitations and did not support her contention

with any argument.  ECF Doc. 16 at 22 n.9.  Nevertheless, the Commissioner asserts that the

ALJ reasonably found that Parham could perform a reduced range of medium work after

adequately considering treatment notes finding mild to moderate knee impairments, conservative

treatment history, and lack of medical opinions showing greater physical limitations than those in

the RFC.  ECF Doc. 16 at 22.  Further, the Commissioner asserts that the ALJ reasonably

determined that Parham was limited to occasional and superficial interaction with coworkers,

rather than no interaction, after considering all the evidence in the record.  ECF Doc. 16 at 23-25.

In her reply brief, Parham argues that the ALJ's RFC should have included a finding that

she had greater limitations in her ability to interact with coworkers.[2]  ECF Doc. 17 at 3.

### 1.    Waiver

Notably, however, Parham's initial brief *did not* clearly argue that the ALJ failed to apply

proper legal standards and reach a decision supported by substantial evidence in assessing her

RFC or support such an argument with record or legal citations.  *See generally* ECF Doc. 13.

---

[2] Parham also adds – for the first time in her reply brief – that the ALJ erred by not strictly adopting all the limitations from the state agency consultants' opinions.  ECF Doc. 17 at 3-4.  Because Parham did not raise a challenge to the way the ALJ treated the state agency consultants' opinions until her reply brief, that argument is waived.  *Kuhn*, 709 F.3d at 624 ("[A]rguments not raised in a party's opening brief . . . are waived.").  Moreover, the ALJ *did* adopt the state agency consultant's opinions that Parham was limited only to "occasional and superficial interaction with the public or coworkers."  (Tr. 23, 126).

Ordinarily, an issue is waived when the plaintiff fails to specifically raise it in her merits brief or raises it in only a perfunctory manner.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief); *Kuhn v Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").  This rule is typically applied when an issue is raised for the first time in a reply brief because the opposing party is prejudiced by an inability to respond to the argument.  *Cf. United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("'It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.'  *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983).").  The other rationale behind waiver is that an insufficiently developed argument impliedly – and improperly – asks the court to develop it on behalf of the parties.  *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'  *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995).").

But when the Commissioner *does not raise the issue of waiver* but instead fully briefs an issue not raised in the plaintiff's opening brief, it would offend reason to say that the Commissioner was prejudiced by an inability to respond to the matter.  *Cf. Creager v. Colvin*, No. 12-cv-12852, 2013 U.S. Dist. LEXIS 121387, at *28-29 (E.D. Mich., Jun. 21, 2013) (Commissioner was "sufficiently on notice" of a Sentence Six remand argument not specifically raised in a plaintiff's initial brief when the Commissioner did not raise the issue of waiver and

fully briefed the argument); *Lemmens v. Astrue*, No. 06-C-473-C, 2007 U.S. Dist. LEXIS 32909, at *10-12 (W.D. Wis., May 3, 2007) (same).  Moreover, it is only natural that a plaintiff be permitted to respond to arguments raised in the Commissioner's response brief.  *Cf. Bender v. Comm'r of Soc. Sec.*, No. 11-cv-1546, 2012 U.S. Dist. LEXIS 128114, at *26 (N.D. Ohio, Aug. 17, 2012) ("A reply brief provides a plaintiff the opportunity to respond to arguments raised for the first time in a defendant's brief.").

Here, the Commissioner correctly states that Parham's statement – that "there was the question of whether her knee problem precluded her from standing/walking six hours a day" – is insufficient to raise an argument challenging the ALJ's physical RFC finding.  ECF Doc. 17 at 22 n.9; *Swain*, 379 F. App'x at 517; *Kuhn*, 709 F.3d at 624.  Thus, any challenge to the ALJ's physical RFC that Parham might have intended to raise in her initial brief is waived.[3]  *Swain*, 379 F. App'x at 517; *Kuhn*, 709 F.3d at 624.  Nevertheless, the Commissioner did not assert that Parham's mental RFC argument was waived but, instead, developed an argument that the ALJ's mental RFC finding was made pursuant to proper legal standards and supported by substantial evidence.  ECF Doc. 15 at 23-25.  And Parham further developed her mental RFC challenge in her reply brief.  ECF Doc. 17 at 3-4.  Therefore, the *Commissioner* has arguably waived any argument that Parham's mental RFC challenge was waived, and Parham did *not* waived the issue.  *See Kilroy v. Husted*, 868 F. Supp. 2d 652, 657 n.1 (S.D. Ohio, Apr. 16, 2012) ("In the

---

[3] Even if the Court were to determine that Parham did not waive any challenge to the ALJ's physical RFC finding, I would nevertheless recommend that the Court affirm those findings because the ALJ adequately complied with the regulations by considering all the evidence in the record.  20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-8p, 1996 SSR LEXIS 5.  And substantial evidence supported the ALJ's decision not to include greater standing/sitting limitations, including: (1) regular findings that she had normal range of motion, normal muscle tone, normal strength, normal gait, full passive range of motion, no edema; and no tenderness;  (2) Parham's own comments denying any joint pain, numbness, and tingling; and (3) her ability to effectively treat any pain or inflammation with ibuprofen and topical anti-inflammatory medications.  (Tr. 328-33, 341, 343, 348, 399-400, 406, 462, 649, 798, 802-03, 805, 811-12, 951, 955).

same way that a movant's argument raised for the first time in a reply brief . . . is waived, a

nonmovant's argument is similarly waived by failing to raise it . . ."), *rev'd on other grounds by*,

No. 12-3590, 2012 U.S. App. LEXIS 26920 (6th Cir. 2012) (case became moot during appeal);

*but cf. McPherson*, 125 F.3d at 995-96.

### 2.  Mental RFC

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by

considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The

RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v.*

*Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR

96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider

limitations and restrictions imposed by all of an individual's impairments, even those that are not

'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical

history, medical signs, laboratory findings, and statements about how the symptoms affect the

claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied proper legal standards and reached a conclusion supported by

substantial evidence in finding that Parham could perform a reduced range of medium work and

was limited only to "occasional and superficial interaction with the public and coworkers."  42

U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d 234, 241.  The ALJ complied with the

regulations by expressly considering "all symptoms" in light of the medical and other evidence,

and undertaking an exhaustive review of Parham's testimony, treatment records, Case Worker

Kelly Kostandaras's third-party function report, and the medical opinion evidence.  20 C.F.R. §§

404.1529(a), 416.929(a); SSR 96-8p, 1996 SSR LEXIS 5. (Tr. 23-26).  Further, the ALJ

adequately explained that, although Parham's medically determinable impairments could be

reasonably expected to cause her alleged symptoms, her subjective complaints regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical and other evidence in the record.  (Tr. 23-24).  And, in doing so, the ALJ specifically discussed Parham's testimony and treatment records related to the effects of her mental symptoms on her social interaction.  (Tr. 23, 25-26).

Substantial evidence also supported the ALJ's conclusion that Parham was only limited to "occasional and superficial" interaction (rather than no interaction), including: (1) examination notes regularly finding that Parham had a normal mood, affect, and behavior; (2) treatment notes indicating that Parham improved with medication and appeared stable; (3) counseling and case management notes indicating that Parham made progress or "significant" progress in addressing her mental symptoms and regulating her emotions; (4) Parham's statements indicating that she was able to improve her emotional regulation and social anxiety with therapy and medication; and (5) Dr. Goldsmith's and Dr. Zeune's opinions that Parham was limited only to "occasional and superficial interaction with the public and coworkers."  (Tr. 126, 153-54, 330, 335, 341, 343, 348, 400, 406, 462, 529 545, 550-51, 553, 557-60, 562-64, 573, 575-76, 591, 595, 599, 563-64, 601-02, 605, 607, 612-13, 649, 714-17, 719-21, 730, 750, 754, 758, 760-61, 764, 766, 771-73, 775-77, 790-91, 798, 802-03, 805, 885, 899, 904, 910-13, 915, 919-20, 922, 955, 966, 977).  Certainly, other evidence could have supported a more-restrictive finding, including notes showing that Parham had difficulty controlling her emotions, was easily agitated or angered, generally mistrusted others, and was paranoid that people didn't like her.  (Tr. 525, 529-30, 534, 539, 543, 554-55, 564, 572, 578, 580, 712, 721, 727, 741, 916, 935, 943).  Nevertheless, even if a preponderance of the evidence supported a more restrictive finding, this Court still could not

overturn the ALJ's RFC finding because substantial evidence supported that finding.  *O'Brien*, 2020 U.S. App. LEXIS 25007, at \*15; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because substantial evidence supported the ALJ's finding that Parham was able to perform a reduced range of medium work and was limited only to "occasional and superficial interaction with the public and coworkers," that decision fell within the Commissioner's "zone of choice" and cannot be overturned by this court.  *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545; *O'Brien*, 2020 U.S. App. LEXIS 25007, at \*15.  Accordingly, the ALJ's RFC assessment should be affirmed.

## VI.  Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Parham's applications for DIB and SSI be AFFIRMED.

Dated: August 28, 2020

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).